**Federal Defenders OF NEW YORK, INC.**

52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Southern District
Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

David E. Patton
Executive Director
and Attorney-in-Chief

May 19, 2020

**By ECF/Email**

Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
New York, New York 10007

Re:   United States v. Oneil Anthony Gordon, 19 Cr. 871 (VSB)

Honorable Judge Broderick:

In May of 1989, when Oneil Gordon was 13-years-old, he and his sister Sharon boarded a plane in Kingston, Jamaica and flew to New York, where their mother Violet was waiting. She had been waiting for years: Violet left Jamaica when Mr. Gordon was just a baby so that she could find a job, send money home to her husband and kids, and eventually petition for them to join her legally. It took a long time, but she finally succeeded in securing green cards for the whole family, bringing them over one or two at a time until they were reunited under one roof in the Bronx.

Six-and-a-half years later, in late 1995, Mr. Gordon—then 20-years-old—was arrested and charged with selling $20 of crack cocaine to an undercover police officer. He does not recall his retained attorney coming to see him even once on Rikers Island before his plea. Nor does he recall being told that although his plea would get him out of Rikers within a few months, it would also prompt his exile from his adopted home.[1] Of course, that is just what happened. On March 25, 1999, after mounting an unsuccessful *pro se* challenge to his removal, Mr. Gordon was deported to Jamaica.

Stranded without his family, Mr. Gordon made a panicked attempt to return just a year-and-a-half later. On October 21, 2000, he was arrested trying to enter the country through Newark International Airport. He never made it out of the terminal to rejoin his family. Instead, he was charged with illegal reentry, sentenced to 30

---

[1] Today, of course, pursuant to the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010), a defendant who pleads without knowledge that deportation will result is understood to have received constitutionally defective counsel. Sadly, because *Padilla* is not applied retroactively, Mr. Gordon is ineligible for any relief regarding his initial removal from this country in light of this violation of his Sixth Amendment rights.

months' imprisonment, and deported to Jamaica again.

Following his second deportation, Mr. Gordon made a good faith effort at building a life in Jamaica. ███████████████████████████████████ ████████. So in 2010, as he quickly confessed when he was interrogated last November, he took a small boat from the Bahamas to Miami and then traveled north to find his loved ones. He lived with them in the Bronx until his arrest.

By the time Mr. Gordon—now nearly 45-years-old—is sentenced on June 3, he will have served more than six months, the top of the recommended 0-6 month Guidelines range, for the crime of reentering the country. During those six months, he has endured two severe lockdowns at the Metropolitan Correctional Center (MCC)—one based on reports of a smuggled gun, and another, still ongoing, as the jail tries to contain the outbreak of the novel coronavirus COVID-19 within its walls. More punishment lies in store: Whenever Mr. Gordon is released from the Bureau of Prisons (BOP), he will be transferred to Immigrations and Customs Enforcement (ICE) custody, and he will remain in detention for an unknowable period of time as he requests relief from removal to Jamaica. In light of the circumstances of his life and offense, the significant punishment he has already experienced, and the punishment still to come, I respectfully ask the Court to sentence him in this case to time served.

## **Background**[2]

Mr. Gordon did not form many positive memories during his childhood in Jamaica. He was still an infant when Violet moved to New York to start putting down roots for the family. Because of the money she sent back to Jamaica, her kids grew up with basic necessities, like food and clothes. But her absence meant that every day was a challenge. Mr. Gordon's father, Seymour, tried his best as a solo parent but drank too much, succumbed to his anger, and used physical force against Mr. Gordon when he misbehaved. Meanwhile, outside of their home, the country was engulfed in political turbulence. When Mr. Gordon was five-years-old, during the 1980 general election, more than 800 people were murdered—caught in the middle of fierce gang and party rivalries.[3]

---

[2] At Mr. Gordon's request, and with the consent of the Government and Probation, the Court has waived the requirement of a Presentence Report (PSR) for Mr. Gordon, and he waives all his rights associated with such a report under Federal Rule of Criminal Procedure 32.

[3] H.G. Helps, *The Bloody General Election That Changed Jamaica*, Jamaica Observer (Oct. 30, 2012), at http://www.jamaicaobserver.com/news/The-bloody-general-election-that-changed-Jamaica.



*Oneil Gordon's picture in his April 1989 Visa application*

On May 5, 1989, Mr. Gordon entered the United States for the first time with his sister Sharon as a lawful permanent resident, ready to leave behind the turmoil of his birth country. His mother, his sister Lorraine, and Lorraine's baby were already living in New York. Seymour followed soon after. His brother, Lyndell, was born in New York. For the next seven years, Mr. Gordon lived with his mother, father, grandmother, sisters, brother, and other family in the Wakefield neighborhood of the Bronx alongside many other Caribbean immigrants who had made the same journey in search of greater security and economic opportunity. Violet got a job in the kitchen of a law firm, Seymour worked as a mechanic, Lorraine became a paralegal, and Sharon became a nurse at a hospital. Mr. Gordon attended high school through the eleventh grade and then started working in the construction industry and helping his mother at work in the law firm kitchen. By the time Mr. Gordon—like too many young men living in New York in the nineties—fell prey to the dual harms of the drug trade and the War on Drugs, everyone he knew and everything he cared about was in New York.

Mr. Gordon was young, immature, and impulsive when he made the mistake that ruined his life. As the Supreme Court has acknowledged, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," particularly in terms of behavior control, which continues to mature through late adolescence. *Graham v. Florida*, 560 U.S. 48, 68 (2010). Indeed, "as compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005). In fact, scientific research over the last decade has revealed that most people do not reach full maturity, in terms of brain development, until age 25.[4] Luckily, for most young adults who tiptoe down the wrong path and get caught selling $20 of narcotics, life does not end there. There are second chances. But for Oneil Gordon, his first brush with the law had much greater weight.

Following Mr. Gordon's release from Rikers Island, on October 2, 1998, he was picked up by the Immigration and Naturalization Service. Four days later, they sent him far from home to Oakdale, Louisiana. Although Mr. Gordon requested two

---

[4] *Brain Maturity Extends Well Beyond Teen Tears*, NPR (Oct. 10, 2011), at https://www.npr.org/templates/story/story.php?storyId=141164708.

postponements in immigration court to try to hire a lawyer, he ultimately appeared without one and was quickly ordered removed on the basis of his conviction. He filed an appeal, again *pro se*, explaining his extensive community and family ties in New York and the psychological, emotional, and financial suffering his family would undergo if he was deported. Eventually, though, he gave up and withdrew his appeal. On March 25, 1999, he was put on a plane to Jamaica.

Mr. Gordon had not set foot in Jamaica since he was thirteen. And in the decade he'd been gone, Kingston's violence had escalated. During a three-week period in July of 1999, a few months after Mr. Gordon's return, gang violence claimed 70 lives in the capital city.[5] So after just a year-and-a-half in Kingston, struggling to keep safe and adjust to life away from his loved ones, he attempted to return to New York. But he never made it back to his family: On October 21, 2000, he was arrested trying to enter the country with a tourist visa at Newark Airport. He was prosecuted for illegal reentry in the District of New Jersey and sentenced—in accordance with the severe, pre-*Booker*, pre-2016 Amendment Sentencing Guidelines—to 30 months' imprisonment. And on December 26, 2002, he was deported again.

Following his second deportation, Mr. Gordon genuinely tried to build a life in Kingston. He lived with Tamara, the mother of his two daughters, and looked for whatever work he could find. 



---

[5] Julian Borger, *Army Ordered to Wage War on Kingston's Gangs*, The Guardian (Jul. 13, 1999), at https://www.theguardian.com/world/1999/jul/14/julianborger.

[6]

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████ That February, he traveled to the Bahamas, and from there to Miami, and then on to New York.

Until his arrest last November, Mr. Gordon lived a quiet life centered on his work and his family. He lived in the same building as his mother and other family members, and he doted on his now-five-year-old daughter. He worked long hours in construction and building maintenance. He stayed out of trouble.

### Time Served is an Appropriate Sentence for Mr. Gordon

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." Id. "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." Id. Six months is more than sufficient to serve these purposes in this case. This is especially true in light of the brutal conditions Mr. Gordon has endured during his time at the MCC, the additional incarceration he will endure in ICE custody after he completes his sentence, and the looming prospect of his deportation.

In the best of times, the MCC is a challenging place to be. Journalists investigating the facility have documented overcrowding, as well as "filth, rodents, overflowing sewage, deeply substandard medical care, wrenching isolation, and often indifferent—and at times, cruel—staff."[8] And Mr. Gordon has not been at the MCC during the best of times.

At the end of February, the MCC was locked down for more than eight days while guards and marshals tossed the facility in search of a loaded firearm.[9]

---

[7] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[8] Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen*, The Atlantic (Aug. 16, 2019), at https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257/; *see also Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden in Plain Sight*, Gothamist (June 19, 2018), at https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight.

[9] Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun,* The Daily News (Mar. 6, 2020), at

U.S. v. Oneil Anthony Gordon  May 19, 2020
Hon. Vernon S. Broderick  Page 6 of 7

Although prisoners were cut off from all contact with their attorneys, friends, and families during the lockdown, they later shared reports of extraordinary neglect and mistreatment. Prisoners were deprived of hot food, showers, clean drinking water, and medical care. Prisoners were forced to lie on their stomachs while guards confiscated or destroyed their personal belongings and legal papers. Men were paraded through the facility in their underwear because they had no clean clothing. Water bugs and mice scurried through living spaces after guards unblocked holes in walls and vents that prisoners had plugged with cloth to keep pests at bay. Even by the standards of the MCC, this was a brutal period of incarceration.

As I write, the MCC is again on lockdown, this time because of the COVID-19 pandemic. The lockdown is the worst of all possible worlds for MCC inmates. On the one hand, the facility's efforts to protect them from the virus have been woefully inadequate—inmates still live in crowded conditions, without proper access to testing, protective equipment, cleaning supplies, or medical care.[10] On the other hand, the measures that have been put in place ostensibly to mitigate the spread of the virus are harsh and isolating: All social and legal visits have been suspended since March 13; prisoners have been let out of their cells for just a few hours each week; they have had limited access to hot food, commissary, showers, phones, and computers, even to contact legal counsel or review legal materials.

It is appropriate for the Court to consider these conditions of confinement—the baseline conditions at the MCC, the brutality of the security lockdown in late February and early March, and the severity of current conditions at the MCC due to COVID-19—in fashioning its sentence. See, e.g., Sent'g Tr., United States v. Ozols, 16 Cr. 692 (JMF), at 30:20-31:14 (giving defendant credit at sentencing for "what he endured at the MDC" during an eight-day blackout); Sent'g Tr., United States v. Serrano, 18 Cr. 393 (LAK), at 9:6-9 (taking into account, "in a way beneficial to [defendant], the terrible conditions that [he] endured at the MDC" during that same blackout); Sent'g Tr., United States v. Gomez Parra, 18 Cr. 869 (RA), at 12:4-6 (considering that the time defendant had spent at the MDC "was harder time and more punishment than is normally the case or ever should be the case").

It is also appropriate for the Court to take into account that Mr. Gordon will not be free when he completes his sentence. See Sent'g Tr., United States v. Rolando Caba, 17 Cr. 442 (ALC), at 6:14-21 (taking into account fact that defendant would be deported and would spend time in immigration custody before his removal). Whenever he is released from BOP custody, he will be transferred to ICE custody to

---

https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306-aws7qoa7ejcozai3i64hms73qi-story.html.

[10] See Cesar Fernandez-Rodriguez et al. v. Marti Licon-Vitale, 20 Civ. 3315 (ER), Complaint, ECF No. 1 (April 28, 2020).

face the prospect of removal to Jamaica. As a result of COVID-19, it is not clear what sort of delays await Mr. Gordon as he prepares to request protection from removal, and he may be facing many more months of confinement. Most significantly, of course, if he loses his fight to remain here, ███████████████████████████ ███████, and he will be separated from his whole family—his aging parents, his loving siblings, his young daughter. This separation will be a more exacting punishment than any term of incarceration.

Finally, the need to prevent unwarranted sentencing disparities, another § 3553(a) consideration, supports a sentence of time served. See, e.g., 18 U.S.C. § 3553(a)(6). Courts in this District frequently impose sentences of less than six months in cases like Mr. Gordon's for defendants with higher Guidelines ranges than his. See, e.g., United States v. William Casillas, 19 Cr. 863 (VSB) (time-served sentence of approximately five months where Guidelines range was 15-21 months); United States v. Manuel Aquiles Martinez, 19 Cr. 370 (WHP) (time-served sentence of less than three months where Guidelines range was 12-18 months); United States v. Bienvenido Paulino-Almonte, 18 Cr. 321 (AT) (time-served sentence of approximately six months where Guidelines range was 6-12 months).

## Conclusion

In light of the foregoing, I respectfully request that the Court sentence Oneil Gordon to time served.

                                          Respectfully submitted,

                                          /s/ Ariel Werner
                                          Ariel Werner
                                          Assistant Federal Defender
                                          (212) 417-8770

CC: AUSA Micah Fergensen